and Mr. Greenberg, you have reserved two minutes for rebuttal. Yes, Your Honor. Okay. And you may begin when you are ready. Thank you. May it please the Court, Judge Lee, Judge Chin, Judge Carney, I represent the three defendants who are correctional officers in this case, Matthew Peralta, Timothy Bailey, and Edward Blunt. As the Court knows, this is a 1983 action in which the plaintiff alleges excessive force and failure to intervene. You also know as well this trial in this case was a pure credibility contest. The plaintiff testified to an alleged assault. The three defendants denied any such assault that ever occurred. A fourth correctional officer, not a defendant but who was also present during the alleged event, likewise testified it never happened. I think in order to understand the extraordinary, and I do mean extraordinary set of events on the third day of the trial, April 28, that led to respectfully error after error after error by the district court. To understand that and to understand how an experienced district court judge could make such errors is to understand this trial was conducted in April of 2021, shortly after the Southern District reopened its courts in the midst of COVID. You see it, for example, on page 51 of the record. Judge Halper actually watched jury selection to see how it was done. Plexiglass, social distancing, my client sat all the way in the back of the courtroom, could not sit with their lawyer because they had to communicate via text. Why do I tell you all of that? Because even the most experienced district court judge would have their hands filled coping in that environment. But on April 28, for example, I believe the judge and parties saw something they probably never heard or saw in a courtroom before. Plaintiff's counsel came in and said, hot off the presses, my next witness were in plaintiff's case in chief just had his life threatened by someone outside in the hallway. A person, by the way, the record is crystal clear, had no connection to the defendants, no connection to plaintiff. Now this court has had case after case after case involving death threat evidence. There was a vast body of case law involving death threat evidence. It's settled and it's crystal clear. All of those cases involve circumstances where the death threat is coming into that courtroom and everyone knows it months in advance. Motions eliminate, the court has briefing and all. Was there an objection made to the testimony about the death threat? There was no opportunity, Judge Chin, to have an objection. Page 567 of the record. The moment Judge Sable hears that there was a death threat in the hallway, she says, I quote, page 567. First of all, obviously it's fair game for you to ask this witness on the stand if it happened. Later on the next page, but if it's true, she says to plaintiff's counsel, it will help your case. Rule 46, Judge Chin, makes crystal clear that there is no obligation to make an objection when there is no opportunity to raise it before the ruling. Can you, I mean, there was an opportunity, was there an objection at the time of the testimony? There wasn't an objection then, was there? The judge ruled the moment she heard there was the death threat, she said, if I might, obviously fair game. The only thing that's obvious under your case is, the only thing. Why couldn't counsel say it's not obvious, Your Honor? Well, because, Your Honor, in this context, something no one in this courtroom, I respectfully submit, had ever seen. No one had the opportunity to run back and see the vast literature. I've been practicing law for 30 years, Judge Chin. I had no idea what the body of law. Well, isn't it just, I mean, certainly things happen at trial, and counsel may not be in a position to cite case law, but if a ruling is being made that is harmful to say to the judge, well, Judge, I don't agree with that or I think this might be a problem, there was nothing like that, was there? There was a motion for a mistrial that came shortly after this, when after the death threat testimony was heard by the jurors, as you would expect, a juror came forward, said they were fearful for their life, connected the dots, attributed to the defendants. But that's a separate, the mistrial didn't relate to the death threat testimony. The mistrial was with regard to the jurors' comments, wasn't it? In response to the death threat testimony. But respectfully, even if you want to use plain error review, plain error review, this is the plainest error you might ever see. Why? The judge says, obviously fair game. Here's what's obvious. There is not a case that I have been able to find ever decided in the Second Circuit when death threat testimony was admitted where there was no connection to either of the parties. Why is there no case that allows that? What about the district court's instruction later, pointing out that there was nothing to associate the death threat to any of the defendants? Didn't that mitigate any prejudice? Judge Shin, I am so glad you asked. The curative instruction was given. The juror then came before the judge after the curative instruction, after the instruction, and connected the dots and attributed it to the defendants. This court has allowed. I'm sorry. Please. Attributed to the defendants. What in the record suggests, I mean, when the juror came forward, he's expressing concern. But what suggests that he is attributing the threats to the defendants? The juror in this case, Your Honor, indicated on page, in 659 to 662, said he connected the dots. And obviously, it was intended to favor the defendants, causing Judge Sabo to say, well, no. So you're basing that he's connecting the dots. You read that as him saying, oh, the threats are coming from the defendants, even though the court has extracted the jury, that that's not the case? Is that your position? No, my position is, in response to Judge Shin's question, the curative instruction cannot unring the bell when you're dealing with death threat testimony. Judge Jacobs in the Morgan case, this court again and again, I can't emphasize enough, I cannot find a case when death threat testimony, ever was in when there's no connection to the parties. Why? Because it is the paradigmatic example of toxic evidence. Any experienced trial lawyer who knew that testimony was coming in, death threat testimony, right outside the hallway, case over, case over. Plaintiff would have no, defendants would have no chance. Let me give you another example of. So you're saying there was nothing the district court could have done to cure the prejudice? That prejudice was paramount and obvious, and there was no way to cure it, despite the fact that objections weren't made at the time, and the ambiguity of the juror's statement and so on. That game was over. Absolutely, Your Honor. And it's clear. When you see, this wasn't the death threat testimony. Did she offer to strike the testimony? She did. She did. And that was her first instinct, because the second era, for the first time in Second Circuit history, a judge allowed death threat testimony as an anticipatory impeachment device. There's no case law in the Second Circuit. Other circuits have addressed it. Allowing testimony. I don't know that you can say it's only the second time in Second Circuit history. I mean, it could have happened and there was no opinion written on it. You're right, Justin. What I'm saying is I cannot find a case, and I don't believe there is one, when a court allowed, in the plaintiff's case in chief, death threat testimony in order to impeach a witness in the defendant's case in chief. And those circuits that have addressed it have said it's disfavored. Why is it disfavored? It's disfavored because the witness might not testify and the testimony would prove to be irrelevant, which is to your point, Judge Chandon. That's why when the judge heard, oh, my goodness, the death threat testimony, she's not going to testify. It's no use. She said, I'm going to strike it. Plaintiff's counsel then said, no, in words of substance, it wouldn't be fair. The courage this plaintiff had, the witness had to testify. And then they cooked up a post hoc rationale to allow the testimony. What was the post hoc rationale? Oh, state of mind. All of that is wrong. And the other thing I would sort of say, another example of it is the linchpin witness, the critical witness. The witness who plaintiff testified about extensively, who plaintiff's counsel in opening statement talked about again and again and again, the eyewitness to the alleged events. Plaintiff's wife, Lisa Magalios, Lisa Tabaldi, at the time of the trial. You say that this was essentially a credibility case or entirely a credibility case. But there was the medical evidence and there was testimony about an imprint of a boot on his back. That seems more objective evidence. Well, the proffer made by defendant's trial counsel in this case was the witness was going to say she did hear from the plaintiff and she was told by the plaintiff that he was beaten by an incarcerated individual. I understand that. But, well, she was going to say that, apparently contradicting what she had testified to under oath, that deposition. Now, is there any other evidence anywhere that an inmate assaulted the plaintiff? Do inmates wear boots? You know, I don't know that there is any evidence to support the theory that an inmate beat him up. I think the court can take judicial notice that incarcerated individuals get into fights. And, yes, there is violence between incarcerated individuals. But the point is there's no report of such an attack. There's no incident report about an inmate attacking him. In other words, it just there does seem to be evidence to support the plaintiff's side of it. The jury, Your Honor, was denied the testimony of the person who plaintiff in the opening statement and in his testimony said was there, testified extensively about her reactions. She was there. She wasn't there at the assault. I mean, she wasn't she was in the facility, but she was not there for the assault. She was there for the linchpin event that allegedly triggers the assault. In the visiting room, she was present. She, according to plaintiff who testified about it, and even what her emotions were, they embraced and hugged. And one of the correctional officers, not any of the defendants, said stop that, used profanity. And that was allegedly the triggering event that would motivate three correctional officers to put their lives, career, and livelihood in jeopardy by assaulting the plaintiff. That's her. She is right there. She is the witness, and I respectfully urge the court, look at the opening statement. Look at plaintiff's testimony. She was going to testify. And yet the judge, again, in a COVID-like environment, like that, like that, without giving anyone the opportunity to object because she said what she was going to tell the witness. She said she was going to tell the witness. You may incriminate yourself. You have a right to consult a lawyer. Unobjectionable. No one would object to that. No one would. Why? Nothing's wrong with that. But then look at what the witness was actually told by Judge St. Paul. She was told not once, not twice, three times, you have a constitutional right to refuse to testify. But your position is that she had no constitutional right anymore because she had waived her right, right? That she had no privilege and that by having given testimony about this earlier, she opened the door to questions under oath as to any aspect of it. And that's a position I don't understand because the crime at issue with regard to the judge's instruction was the crime of perjury. She had not testified. She testified as to other events, but she is not at risk of perjury in her early testimony. So maybe you could explain what I'm missing. Yes, Judge Carney. And Judge Sabo told her. Seibel. Seibel. Forgive me, Judge. Told her it was a crime. It was illegal. You could be, you, Ms. Tabaldi, could be convicted. To testify falsely. Correct. She had not testified as to the prior inquiry in her sworn statements was as to this event, not as to what was not later proffered, that she was going to testify contrary to what she had said before under oath. So isn't that a different concern that would require a lawyer? She wasn't at risk of being prosecuted for giving an account initially as to an event, a meeting, in which she had no participatory role. I understood that the admonishment was that if you testify differently, it's the first sentence in the admonition. Yes, yes. If you testify differently, you may incriminate yourself by testifying falsely. I think the word falsely was used. Yes. My point just about that, though, that was contrary to several circuits' decisions, incorrect instruction that she had a right to refuse to testify. Incorrect. Other circuits have addressed the issue under the same proceeding rule. If you testify in a deposition, you cannot invoke a Fifth Amendment right to refuse to testify at the trial. Error one. Error two, you don't even have to reach that. What other circuits and virtually a uniform body of Federal case law hold with respect to the waiver issue? Error two, you set forth the two-prong test incline as to how you determine whether or not there was a waiver of a Fifth Amendment privilege. All the cases I've looked at that you've cited have to do with refusing to testify as to the matters, the substance of the matters that the person had originally testified as to. Yes. Here there was a different crime issue as to which one might need counsel, which was that she was going to give testimony presumably contrary to what she had testified under oath before. Yes. So she did not need counsel necessarily in the first because she was not charged with any crime. She had not done the beating. And later on, if she was going to testify separately, I don't understand why it was improper to advise her that testifying that she was opening herself up to a perjury charge by testifying inconsistently with initial statements. Maybe one of my colleagues can explain it better than I am, but I'm having difficulty understanding your position seems to be that once you've testified as to an event, you may always be forced to testify as to that event regardless if you're taking a separate position later about what happened. Our position and the position of other circuits is that if you in a single case, in a deposition testify to A, B, C, and D, you cannot invoke a Fifth Amendment right to refuse to testify at the trial about A, B, C, D. You have waived that right. So she had to be put on the stand and questioned. She had to answer those questions. And if she answered them in a way that your clients didn't like, then so be it. Absolutely. And if she answered them in a way consistent with the proffer of counsel perjuring herself, then so be it. Yes, Your Honor. And I do have some rebuttal. Thank you for your indulgence on that. Thank you. Mr. Sivin. Thank you, Your Honors. Edward Sivin for the appellee. Can I get one minute on my cross-appeal rebuttal? Yes. Okay. Thank you. What is fatal to the appellant's argument that they were denied the right to call Lisa Tabaldi is that they chose not to call Lisa Tabaldi. After this discussion about the Fifth Amendment and counsel announced to the court she doesn't want to testify, Judge Seibel stated, and I quote on page 606, quote, you can still call her. She's here. They chose not to call her. They can't now turn around and say we were deprived of the right to call her. Nor can they say that they were deprived of an opportunity to object. They had several opportunities. Beginning on page. I think their position is that the court improperly intimidated Suede, what have you, Ms. Tabaldi into not testifying. That's what the problem is from their point of view. But if you look at the court's instruction, it was very benign compared to what other cases have held is intimidation. The court said to Ms. Tabaldi, among other things, I'm not suggesting that any prosecutor would have any interest in your case or that any prosecutor would prosecute you for lying under oath, but you need to be informed that it is a possibility and that lying under oath is illegal and that if your testimony would be that you previously lied under oath, you would be incriminating yourself and you have a right under the Fifth Amendment not to do that and I encourage you to consult with counsel. Not only was it not improper for the judge to do that, but I think had the judge just said, you know, let's throw her to the lions, let her go in and testify and perjure herself, that would have been error. And with respect to the Klein case, which is the seminal case by this circuit regarding what type of statements are incriminatory, on page 288 of the Klein case, this court stated that the statements must have been made under oath, which they were at the deposition, and they must be, quote, incriminating, meaning that they did not merely deal with matters collateral to the events surrounding the commission of the crime, and here there was no crime to which Lisa Tabaldi potentially could be involved. The only potential crime was the officers, but directly inculpated the witness on the charge at issue. There was nothing that inculpated Lisa Tabaldi on the charges at issue when she testified to what her ex-husband told her. It is troubling that the evidence came in for a certain purpose and then it turned out she didn't testify and so there is this evidence of a death threat, and Judge Seibel's first instinct was to strike it, but was it you who tried it? No, it was me and my partner. Your partner objected and it stayed in. It would have been cleaner just to strike it. Well, it was, number one, it was relevant to the issue of the witness' state of mind, which cases have said can be inappropriate. The judge who was sitting there. And what does that mean? How was his state of mind relevant? He looked nervous, anxious? Well, according to the judge, he looked freaked out. Now a jury could possibly interpret his being freaked out as, is he lying on the witness stand? Or maybe he's freaked out because somebody just threatened his life. But, again, defense counsel had an opportunity to object to that. In fact, on page 607, the court said, well, I guess what I could do is say it's only to be considered for what effect it might have on his state of mind, because although he warmed up as he went along, he clearly was nervous at first, so I think you're right. I think it's perhaps relevant to explain why he was a little freaked out at first, but I'll make sure that the jury understands there's nothing about the threat that should be holding against either side. Seemed fair, Mr. Miller, my partner, said, I think that's fair compromise. And then Ms. Acosta-Pettijohn for the defense said, thank you, Your Honor. Not, Your Honor, that's not right. You should not give that instruction. She acquiesced and said, thank you, Your Honor. If I can turn briefly to the issue of punitive damages. There's no one in a better position than the trial court to make a determination as to the reasonableness of a jury's award on punitive damages. Here there was an unprovoked, premeditated If that's true, what about your cross appeal? That's also You're in a sort of a difficult position here. Reasonable with respect to it being not too high, but unreasonable in that it is too low, the awards? That's kind of what you're arguing. I'm not sure I understand you, Your Honor. It's okay. It's not artfully formed. Go ahead. Okay. But in any event, the judge who sat through this trial and the jury was entitled to conclude not only that these officers engaged in this vicious premeditated attack, but that the day after the attack, when they were questioned by their supervisor, denied that anything happened, one of them even said, I don't remember anything about yesterday or who I was working with. The jury and the judge were also entitled to find that the defendants lied on the stand about the incident. And not only did they not show any remorse at the trial, but they showed contempt for the court and for the plaintiff by laughing during the proceedings. And in the case of one of the defendants, Officer Blount, beginning his testimony on the witness stand by hurling a profanity at Mr. Magalhaes. It's no wonder that the court under these circumstances concluded the jury's award doesn't shock my conscience. But the court felt constrained by this court, by what it viewed as the precedent of this court, to reduce the jury's award. Is it clear, though, that the judge was acting out of a sense of, I mean, certainly there was the comment about this doesn't shock my conscience, but there was a lot of grappling with considering the appropriate factors and the ratios and all of that. I mean, it didn't, I did not get the impression that the judge thought, well, I have to make this determination on their mound. I had the impression that the judge was considering all these factors and said, this is what seems to be appropriate. And, you know, given, to take another version of what Judge Chen was suggesting, given your recognition that the judge did see the testimony, was present for all this, has the best sense of the case, what reason is there to find that the number that she landed on was an abuse of discretion? Because I think the judge misinterpreted Second Circuit precedent by putting too much emphasis on the ratio between compensatory damages and punitive damages. The most important factor in punitive damages, as the courts have held over and over again, is the egregiousness of the conduct. And the court agreed this was really, really egregious. Not only was their conduct egregious at the time, but continuing all throughout the case and into the courtroom. Having come to that conclusion, I think it was error for the court to then determine that it was not permitted to uphold the jury's award on punitive damages. And in our cross-appeal, we're respectfully asking this court to announce that the facts of this case, under the facts of this case, it would not have been an abuse of discretion for the court to abide by its conscience. And that, in fact, it was error for the court to disregard its conscience. So you're saying basically it was a legal error in how she weighed the factors. Yes. Unless the court has anything else for me, I'm going to rest on my brief. All right. Thank you. Thank you. Just a few quick rebuttal points. With respect to the admonitions given by the district court to Ms. DeBaldi, Judge Carney, you understood our argument exactly right. No sentient person, let alone a lay person, who received warnings like that. You can refuse to testify. You can refuse to testify. You can refuse to testify, would testify under those circumstances. But you could have called her, correct? Your adversary says you could have called her. Is that correct? To his second point, could have called her. This is after the death threat evidence comes in, in which the death threat evidence says it's her boyfriend. Her boyfriend, right? So that would be the plaintiff. Defendants would have called her so she could take the Fifth over and over and over again and then be impeached on the death threat evidence. With all respect, Your Honor, that was not even a theoretical proposition. It would have amounted to nothing more than preserving some kind of argument for this court. So your colleague on the other side points out the colloquy at pages 607 and 608. Judge Seibel says, seeing fair, and the defense counsel says, thank you, Your Honor. Defense counsel could have said, that's not fair. I object or propose something different. What defense counsel was facing, Judge Chin, is when the judge first heard about this, she said, obviously fair game. A district court judge is telling you, obviously fair game. Judge Seibel made a proposal as to how to handle this, asked both sides if it seemed fair. Plaintiff's side said, I think that's a fair compromise. And the defense side said, thank you, Your Honor. I mean, what is Judge Seibel supposed to do with that? I believe what Judge Seibel should have done the moment she heard that there was death threat evidence. Oh, I understand. You go back to the earlier point then. Yes, Your Honor. With respect to the death threat testimony, opposing counsel says it was relevant, and Judge Chin, you were asking questions about it's relevant. That's not the law. This court in the United States v. Morgan said, not relevance, there must be a showing that the evidence serves an important purpose and is clearly needed. This much is clear. This much isn't debatable. This death threat evidence, notwithstanding objections preservation, was clearly error to come in. And had there been an objection contemporaneously after the court, you're not objecting to testimony being produced. You're objecting to a court who has ruled clearly obvious that would be error. Finally, with respect to their claim that somehow or other the punitive damages, which in this case assessed against three correctional officers who were state employees in the amount of a half million dollars, right, is somehow not sufficient. First of all, it's clearly, I would suggest under your precedent, excessive. This court would conduct infinitely worse, and I'm not diminishing the conduct here, the alleged conduct, right? I'm not diminishing it. You have had cases with people beaten with batons, handcuffed, rendered unconscious, and remitted the punitive damage awards to amounts less than this. And the jury awarded $950,000 total? $50,000. That was the award, which gets us to the punitives. The jury awarded a million. If memory serves, $350,000, $350,000. $250,000. $250,000. And the court below essentially halved that. But the argument, I think, on the cross appeal is that somehow or other too much emphasis was given on the second Gore factor comparing the compensatory award to ratio. No, it wasn't. You've spoken to that issue in your decision internally where you held in a case where the compensatory awards is substantial, $50,000 is substantial for three correctional officers, and the punitive award is stacked up on top of it, and both awards amount to visceral pain and suffering kinds of damages. Here there were no lost medical bills. There was no inability to go to work or any of that. It was pain and suffering. When you stack that up, then you can look at ratios, and this court has said a 4-to-1 ratio treads on thin ice constitutionally. Well, that's essentially what the court below ended up awarding. The $200,000 was 4-to-1, 4-to-1. And the final thing I'll say with respect to Mr. Blunt, who is not alleged to have been actively involved in the assault, the claim is that he failed to intervene. Under your precedence, a $100,000 punitive award, and, again, I'm not trying to diminish the alleged conduct, is wildly excessive for someone who's alleged merely to have observed and not acted. So for all of the reasons in our briefs and my argument, we respectfully request that you reverse and order a new trial in this case. Thank you very much. Thank you. Just very briefly on the issue of punitive damages, I don't think it's useful to limit the discussion to talk about whether he was kicked or whether he was hit by a baton. I think what's more important in this case is that this was not an instance of officers overreacting and then afterwards saying, okay, maybe I overreacted. This was an instance of the officers then covering it up and then fabricating statements about it, coming to court laughing, snickering, and doing everything to avoid any type of responsibility, showing no remorse but only showing contempt. And that's a factor that aggravates this case and that should sustain the jury's original award. Thank you. Thank you both. We'll take the case under advisement.